[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Nature of Proceedings
Fourteen months after being placed in the temporary custody of the Department of Children and Families (DCF) at birth, Theresa R., daughter of Angelia R.,[1] became the subject of this petition by which DCF seeks to terminate her mother's parental rights so that she may be freed for adoption by the only caretaker she has known since her birth on January 27, 1996.
At the initial hearing on May 19, 1997, service was confirmed on Angelia, who appeared with the same attorney who had represented her since DCF first assumed Theresa's custody in February of 1996. On June 2, 1997, upon the mother's motion, CT Page 9972 psychological evaluations of mother and child were ordered. Despite the fact that the evaluation by Dr. Ruth Grant was favorable to the petitioner's petition (States Exh. D), the mother, through counsel at a pretrial conducted August 18, 1997, continued her objection to the relief sought, necessitating a trial on the merits. Since the petitioner had checked every one of the five listed nonconsensual grounds for terminating parental rights as set forth in Section 17a-112 of the Conn. Gen. Stats. (Rev. 1995), at a judicial pretrial conducted October 9, 1997, the court, suo moto, dismissed two of the five grounds pleaded for failure of the pleadings to disclose any facts which, if proven at trial, could support those grounds: Denial of care by reason of acts of parental omission or commission (no facts were pleaded suggesting that the child had been denied any proper care since birth, In ReKezia M., 33 Conn. App. 12, at 19-20 and failure to rehabilitate by a parent who has previously had parental rights terminated by this court (Angelia's parental rights had not been terminated in either of her two older children).
Because Angelia was being released in November of 1997 from the halfway house in which she had been placed following her most recent period of incarceration, proceedings were stayed to determine if her announced intention to follow through on drug treatment and be consistent in visitation might warrant withdrawal of this petition. When, however, a drug test administered two months after her release showed a positive toxicity for morphine (State's Exh. C) and she failed to secure a follow-up urinalysis to confirm her excuse that she had eaten a poppyseed bagel before that test, she was discharged from the 90 day aftercare program of the halfway house (State's Exh. B), and the petitioner reclaimed it for trial. In a judicial pretrial on April 13, 1998, a trial date certain was set for May 18, 1998. Trial was concluded on August 10, 1998.
Operative Dates
Since the original petition has never been amended, facts as of the original filing date in April of 1997 must determine the existence of grounds for termination; facts as of the final trial date of August 10, 1998 may be considered in determining disposition; the parties having presented closing arguments on that final trial date, the period of reserved decision commences on August 10, 1998.
Facts
CT Page 9973
A stipulation of facts signed by all parties in December of 1997 and accepted by the court on April 24, 1998, as well as testimony and exhibits offered in evidence on two trial days, interpreted in the light of the entire record in this court affecting this mother and child, permits the finding of the following facts:
Theresa was born prematurely on January 17, 1996, to a mother with a ten year history of drug addiction. Angelia had received no prenatal care during this pregnancy and evidenced cocaine, heroin and methadone in her system at the time of birth. The baby, withdrawing from the same drugs in her system, was in fetal distress necessitating medication for withdrawal as well as for seizures. (Court's Exh. 1, Stipulation of Facts dated December 17, 1997). The child was placed from the hospital into a foster home especially licensed for medically fragile children on February 11, 1996, where she remains to date. Two older children born to Angelia nine and thirteen years earlier, were, and continue to be, in the guardianship of the maternal grandmother who, at the outset of DCF involvement, was unable to offer her home to this child. (State's Exh. F, unnumbered fourth page.) On March 25, 1996, with the mother's agreement, the child was adjudicated neglected and committed to DCF for an initial period of twelve months. Expectations were spelled out by the court to facilitate eventual reunification with her child. (Court's Exhibit A of 5/18/98). These included visiting the child as often as permitted, participation in drug treatment, securing of adequate housing, refraining from substance abuse, and no further involvement with the criminal justice system. At an in-court review on June 24, 1996, the mother, who had not visited once since the child's commitment, was warned by the court of the possible termination of her rights if this should continue. Three visits took place in the following three months (July 3, August 21 and August 29, 1996) while she failed to appear at four other scheduled visits (July 27, August 7, September 22 and October 9, 1996). Since she was still abusing drugs on September 30, 1996, as disclosed at another in-court review on that date, Angelia's drug counselor at the Connecticut Counseling Center recommended long-term in-patient treatment. Instead of following that recommendation, however, Angelia, on November 17, 1996, was discharged from the Counseling program due to her non-compliance with its requirements. (Stipulation, supra.) Three months later she was in Niantic, and two months after that, twelve months after assuming custody, DCF filed this petition. CT Page 9974
On March 3, 1997, Angelia agreed to the extension of Theresa's commitment. The court, in granting the extension, further found that continued efforts to reunite mother and child were no longer appropriate in view of the fact that the mother had seen the child only three times since her placement in foster care the previous year, and was now incarcerated. DCF announced its permanency plan to be termination of parental rights to free the child for adoption. The following month DCF initiated this action.
On August 1, 1997, Angelia entered NEON, a halfway house drug treatment program in Waterbury. Although many women leaving Niantic for this program stay from 14 to 18 months, Angelia exercised her right to leave the program despite being urged by staff to stay longer. (Testimony of Joyce Brown, NEON program director.) On her discharge, Angelia signed an agreement to follow the NEON program for 90 days, involving weekly meetings (she came three out of a possible ten times); weekly house meetings (she came once out of a possible ten times); and submit to random urine screens. The first such screen was not taken until ten weeks after her discharge, on February 14, 1998 when she tested positive for opiates. Her attorney called NEON to seek their continued involvement, but because she did not submit to a retest as requested, she was discharged from the NEON aftercare program. She could not reenter NEON except after being again incarcerated. Although Angelia did not testify on her own behalf, questions from counsel elicited that it would be necessary to "eat a bag of poppy seeds" to produce a positive toxicity for opiates. If a methadone program had accepted her in May of 1998, it would only have done so if she were actively using heroin, but the petitioner offered no evidence that she had been accepted into such a program.
Dr. Ruth Grant evaluated mother and child in June of 1997 while Angelia was incarcerated and soon after monthly visits had been instituted at the prison. (State's Exh. D.) Despite the mother's appropriate behavior, this hypersensitive child was "obviously fearful, tearful and avoidant":
In spite of her mother's best efforts to get to know her, Theresa does not appear to be open to this interaction at this time. For her part, Angelia cried and became tearful when she saw how the baby was reacting. She tried all that she could to gently interact with her, but it was to no avail. (Id., unnumbered p. 6.) CT Page 9975
While Angelia requested that Theresa be placed with her at NEON, Dr. Grant did not recommend this "due to Theresa's personality dynamics and needs," concluding:
 The prognosis for Angelia and Theresa's reunification does not appear to be good at this time. Angelia is really trying but Theresa behaves as if she were a traumatized special needs child. Angelia needs to place all of her energy in remaining drug free and learning to feel good about herself once again. (Id, p. 7.)
Dr. Grant performed an update to this evaluation on February 5, 1998, following Angelia's leaving the residential NEON program, but before her discharge from the aftercare phase. (State's Exh. E.) Dr. Grant found their interaction "much improved" as a result of the by-weekly visits which took place while the mother was in residence at NEON, but observed that, "The bond that exists between a child and a parent is not yet there, however." She recommended that "visits continue as long as the mother remains drug free and in a treatment program." (Id., unnumbered p. 4.)
Nine days after this evaluation, Angelia produced a positive toxicity for opiates, and by March 2, 1998, after having failed to comply with the request of NEON for a retest, she was discharged from their treatment program. No evidence was offered by the mother of any other drug program in which she was involved at the dispositional date. In her testimony of August 10, 1998, Dr. Grant recommended that all visitation stop with the mother's positive drug test and subsequent failure to become involved in any drug program since "even though the love continues, her ability to get off drugs hasn't". Dr. Grant recommended that Theresa be adopted by her foster family, that she should not be required to wait longer than her then 30-months of life for a permanent home, and that further delay of permanency for this hypersensitive and delayed child, with the possible change of caretaker still later, could be "catastrophic". Despite Dr. Grant's clear recommendation to cease visitation, DCF never refused requested visits. As recently as in June of 1998, the mother requested that Theresa be brought to Waterbury for a visit. She was, but Angelia could not be found. When Angelia called DCF to reschedule that visit, her request was granted. Once again Theresa was transported to Waterbury; once again the mother could not be found. (Testimony of DCF social worker King, August 10, 1998) CT Page 9976
Adjudication — on facts as of April 25, 1997
DCF has established by the requisite clear and convincing standard of proof three grounds for terminating Angelia's parental rights:
1. In the thirteen months between Theresa's commitment to DCF and the adjudicatory date, Angelia had visited her just three times. Four other visits had been arranged which Angelia failed to attend. Visitation was only predictable and regular when Angelia became incarcerated in February of 1997. This constitutes clear and convincing proof of abandonment within the definition of Sec. 17a-112 as the failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child". Three accomplished visits in a period of more than a year does not rise to the level of a reasonable degree of such interest.
2. During that same period of time Angelia failed to enroll in a recommended in-patient substance abuse treatment program, and by November of 1996 had even been discharged for non compliance with the requirements of the out-patient program she had been attending. After three months without drug treatment, Angelia was incarcerated at Niantic, and no evidence was then offered as to her involvement in any drug treatment program in that institution. Most significantly, at no time during the first fourteen months that Theresa spent in DCF custody, had her mother ever held herself out as a ready, willing and able caretaker for this special needs child. This constitutes clear and convincing proof that Angelia has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.
3. While regular monthly visits in Niantic, followed by bi-weekly visits during the four months Angelia was in the residential NEON program, greatly improved the mother-daughter interaction, in June of 1997, shortly after the adjudicatory date, Dr. Grant observed no evidence of an ongoing parent-child relationship as defined in Sec. 17a-112, and the child showed no signs of recognition of, or a positive response to, her mother. The fact that Theresa was removed for cause from Angelia's custody at birth does not preclude a finding of this ground when the child, because of the paucity of visitation, has "no present memories or feelings for the natural parent."In Re Kezia M., supra, at 21 (1993), citing In Re Jessica M., 217 Conn. 459, 468 (1991). Theresa in April of 1996, as Kezia M. five years earlier, had ". . . no positive emotional ties to" her mother. CT Page 9977 "Instead, she exhibits indifference or hostility" toward her. Theresa's mother, as Kezia's father, had had time in which to establish a relationship with her daughter, even in foster care, but failed to do so. And based upon the factors enumerated in the Kezia
opinion, (the length of time this special needs child had lived with her foster parents; the nature of her relationship to them; the scant contact maintained with her biological mother; and the nature of the relationship between them), to permit still more time for Angelia to develop such a relationship would be detrimental — Dr. Grant used the term "catastrophic" — to the child. This constitutes clear and convincing proof that as of the adjudicatory date, no parent-child relationship existed and to permit further time to establish such relationship would be detrimental to the child's best interests.
Disposition — On facts as of August 10, 1998
In the fourteen months between the adjudicatory and dispositional dates, Angelia made progress toward achieving some of the expectations that had been spelled out for her at the time Theresa was committed: For the five months she was in Niantic, monthly visits occurred. For the next four months during her residency in NEON, bi-weekly visits took place, and the relationship between mother and child began slowly to thaw. But Angelia chose to leave NEON, and the consequent sobriety and regularity of contact with her daughter, after only four months, against the recommendation of the NEON staff. Within three months, she was again using opiates, and her failure to comply with the minimal NEON outpatient drug treatment program requirements, resulted in her being discharged by March of 1998. DCF, willing to suspend pursuing this petition during the nine months when Angelia was in prison and in NEON, now requested that it be placed back on the trial docket. But visits continued at the mother's request: In June of 1998, between the two trial days, Theresa was twice driven to Waterbury for visits which her mother had requested, only to find that the mother could not be located for these visits. Angelia offered no testimony on which a court could conclude that the sobriety she achieved while in prison and in residential NEON continued, that she had secured adequate housing or otherwise continued to prepare to assume care of this fragile child.
Based upon these operative facts as well as on the unequivocal testimony of the clinical psychologist who had twice evaluated the parent-child relationship during the pendency of CT Page 9978 this action, it is found by clear and convincing proof to be in the best interests of this child for her to achieve the assurance of permanency with the only parent she has known since birth, one who has demonstrated the capacity to meet her extraordinary special needs and who is clearly motivated to assume full responsibility for her welfare permanently.
Seven mandatory findings
Even though there is clear and convincing proof that three statutory grounds exist for terminating Angelia's parental rights, and that such termination is in the child's best interests, this court may not terminate such rights until it has fully considered the seven factors set forth in subsection (e) of Sec. 17a-112:
1. DCF offered all the services that can be made available to a parent with a decade-long drug history during the 21 months that the mother was living in the community out of the 30 the child was in DCF custody. She was permitted to visit every time she requested, but succeeded in visiting only three times in the year between the assumption of custody by DCF and when she was incarcerated. She was referred to drug counseling and failed to follow their recommendation for in-patient treatment, and finally was discharged from the out-patient program she was in. While incarcerated at Niantic and, later, a resident of NEON, she presumably remained drug-free and exercised her visitation rights to the full extent permitted. But upon her premature departure from NEON and return to the unmonitored community, she resumed the use of drugs in February of 1998 — ten months after initiation of this termination action — and failed to keep two prearranged visits which necessitated the child's being transported to Waterbury — between the two trial dates for this action. Apart from arranging visits when requested, providing transportation, and making repeated referral to drug treatment programs, no other services would have been appropriate.
2. DCF made all reasonable efforts to unite — not reunite since Angelia had never had responsibility for her child's care since birth — this family, including agreeing to stay these proceedings after initiating them to see if the mother could sustain the sobriety and regular contact that began with her incarceration. She could not, resulting in the delay of CT Page 9979 permanency for Theresa of an additional year. This finding can be made by clear and convincing evidence, although such finding is not required under subsection (c) of Sec. 17a-112
in view of the fact that a month before this petition was filed, the court had found that such efforts were not appropriate during the extension hearing conducted in March of 1997 pursuant to subsection (b) of Section 17a-110.
3. No orders were imposed in this matter, except for Angelia to attend court and psychological evaluations, which she did. While not orders, the expectations articulated at the time of commitment by the court on March 25, 1996, were, in nearly every aspect, unfulfilled during the 30 months Theresa was a state ward:
— Angelia did not keep all appointments set by or with DCF
 — She did not visit the child as often as DCF would have permitted.
 — She did not sustain drug treatment for more than 10 weeks after being discharged from inpatient treatment.
— She did not secure adequate housing.
 — The first random urine screen conducted after she left the NEON residential program was positive for opiates.
— She became reinvolved with the criminal justice system.
4. Dr. Grant's two evaluations made it clear that the child is primarily bonded with the foster parent with whom she has lived her entire lifetime. Even nine months after Angelia initiated regular visitation — first monthly; then bi-weekly — the relationship she observed between mother and daughter was not that of a parent and child. In contrast, the testimony of the social worker establishes the close parent-child relationship which, understandably, exists between a two-and-a-half year old and her "mom".
5. Theresa, on the dispositional date, was two-and-one-half years old. Having spent her entire life in the care of a person who is willing to adopt her, and who has demonstrated the ability to meet her specialized needs, she should not be required to await permanency any longer. CT Page 9980
6. Angelia made appropriate efforts to adjust her circumstances to make it possible for Theresa to be placed in (not returned to) her care, but these efforts began only with her incarceration two months before this petition was filed, and were sustained only so long as she was in Niantic prison or in NEON's residential program. She only maintained regular contact with her daughter when in these programs; the pattern of missed visits began soon after she was living independently in the community.
7. Nothing prevented Angelia from maintaining a meaningful relationship with the child by the unreasonable act of any person or her economic circumstances. This is a tragic situation of a mother who would very much like to provide for this child, but her drug addiction has prevented from doing so since the child's conception.
Judgment
Having found by clear and convincing proof the three findings required by subsection (c) of Sec. 17a-112, and having considered fully the seven factors discussed above, it is herebyordered: That the parental rights of Angelia R., sole biological parent in the absence of any named father, in and to her child Theresa R. be, and hereby are, terminated. It is further ordered that the Commissioner of DCF be appointed statutory parent for the purpose of placing this child forthwith in adoption, and to secure this result, it is furtherordered that the said Commissioner shall file no later than November 30, 1998 a written report as to the status of the adoption procedure. Should adoption not be finalized a year from the date of this judgment, DCF is ordered to file a Motion to Review Plan for Terminated Child for a hearing to be scheduled on or before November 30, 1999. If such motion is not filed by the end of September of 1999, a hearing shall be called on the first short calendar of October, 1999, for DCF to show cause why it should not be found in contempt for failure to file such motion pursuant to this order.
Entered at Norwalk this 31st day of August, 1998
Frederica S. Brenneman, Judge